ROBERT C. SCHUBERT S.B.N. 62684
JUDEN JUSTICE REED S.B.N. 153748
PETER E. BORKON S.B.N. 212596
SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, California 94111
Telephone: (415) 788-4220
Fax: (415) 788-0161

*Attorneys for the Plaintiff,
and all others similarly situated*

FILED
05 JUL 18 PM 4:03
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| PATRICK J. HEWSON, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> INTEL CORPORATION, a Delaware corporation, <br><br> Defendant. | Case No. C 05 2916 SC <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

**Table of Contents**

NATURE OF THE ACTION ..................................................................................................1

JURISDICTION AND VENUE ..............................................................................................1

THE PARTIES .........................................................................................................................1

FACTUAL BACKGROUND ..................................................................................................2

    A.   History Of x86 Microprocessor Market .................................................................2

    B.   Intel's Anti-Competitive Conduct Begins ..............................................................3

    C.   Intel's Exclusion of Competitors in the x86 Microprocessor Market ....................4

    D.   Intel Uses Original Equipment Manufacturers as Distributors ..............................5

THE WRONGFUL CONDUCT .............................................................................................6

    A.   Intel's Practices Directed at OEMs .........................................................................6

    B.   Intel's Practices Directed At Distributors ............................................................10

    C.   Intel's Practices Directed At Retailers .................................................................11

    D.   Intel's Exclusionary Standard Setting and Technical Abuses .............................11

CLASS ACTION ALLEGATIONS ......................................................................................13

TRADE AND COMMERCE ................................................................................................14

ANTITRUST INJURY ..........................................................................................................15

DAMAGES ............................................................................................................................16

FIRST CLAIM – VIOLATION OF 15 U.S.C § 1 ................................................................16

PRAYER ................................................................................................................................17

JURY DEMAND ...................................................................................................................18

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

Plaintiff, individually and on behalf of the class described below, brings this action for treble damages and injunctive relief under the laws of the United States against Defendants, demanding a trial by jury and alleges as follows:

## NATURE OF THE ACTION

1. This is a class action on behalf of all individuals and entities who indirectly purchased microprocessors that run Microsoft Windows and Linux computer operating systems (the "x86 Microprocessor Market") in the United States from Intel Corporation ("Intel") or its subsidiaries at any time in the past four years.

2. Intel and its subsidiaries, agents or co-conspirators sold the x86 microprocessors and entered into and implemented a continuing combination and conspiracy to fix, raise, maintain or stabilize prices for x86 microprocessors sold in the United States. Because of Intel's unlawful conduct, Plaintiff and other members of the class paid artificially inflated prices for x86 microprocessors and have been damaged thereby.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332 (as amended) and 1337, and sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

4. Venue is properly laid before this Court under 15 U.S.C. §§ 15, 22 and 26 and 28 U.S.C. § 1391 (b) and (c), because Defendant transacts business, maintains offices, or is otherwise found within this district, and many of Defendant's unlawful acts giving rise to Plaintiff's claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out, in this district.

## THE PARTIES

5. Plaintiff **Patrick J. Hewson** indirectly purchased an x86 microprocessor that was manufactured, distributed and/or sold by Intel Corporation during the class period, and was injured by antitrust violations alleged herein.

6.      Defendant **Intel Corporation**, ("Intel") is a Delaware corporation with its principal executive officers in Santa Clara, California. Intel conducts business both directly and through wholly-owned and dominated subsidiaries worldwide. Intel and its subsidiaries design, produce and sell a wide variety of microprocessors, flash memory devices, and silicon-based products for use in the computer and communications industries.

7.      Certain other person, firms, corporations, partners, associations and/or entities participated as co-conspirators (the "co-conspirators") with Intel in the violations and conspiracies alleged in this complaint. In order to engage in the offenses charged and violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein.

8.      The acts alleged in this complaint were committed by Intel or were ordered committed by Intel's officers, agents, employees, or representatives, while actively engaged in the management of Intel's operations or affairs.

## FACTUAL BACKGROUND

**A.     The History Of the x86 Microprocessor Market**

9.      A microprocessor is an electronic computer central processing unit (CPU) made from miniaturized transistors and other circuit elements on a single semiconductor integrated unit (aka "microchip" or "chip").

10.     Before the advent of microprocessors, CPU's were made from separate integrated circuits; before that, individual transistors; and before that, from vacuum tubes. There have even been designs for simple computing machines based on mechanical parts such as gears, shafts, levers and Tinkertoys, etc. From humble beginnings as the drivers for calculators, the continued increase in power has led to the dominance of microprocessors over every other form of computer; every system from the largest mainframes to the smallest handheld computers now use a microprocessor at their core.

11.     Microprocessors are defined by their computer's machine language instructions. A computer's operating software provides those instructions so that the computer can perform

meaningful tasks. Over time, microprocessors advanced from 16-bit capability to 64-bit capability allowing highly complex graphical interfaces such as Windows.

12. In 1981, IBM introduced the personal computer. IBM chose to use the Intel microprocessor in its personal computers. The Intel microprocessors used and therefore became known as the "x86 instruction set." In order to ensure that it was not consigned to one microprocessor manufacturer, IBM demanded that Intel license another integrated circuit company to manufacture x86 chips as a second source. In response, Advanced Micro Devices, Inc. ("AMD") agreed to abandon its own competing architecture and instead manufactured x86 chips as a second source for IBM.

13. In 1982, Intel and AMD entered into the AMD-Intel Technology Exchange Agreement (the "Agreement"). The Agreement called for each entity to serve as a second source for products developed by the other. Nevertheless, Intel soon set out to secure an advantage over AMD, sabotage AMD products and constrain AMD's progress. Intel's conduct resulted in litigation with AMD.

14. In 1992, after five years of litigation, an arbitrator hearing the dispute that resulted from Intel's conduct in violation of the Agreement awarded AMD more than $10 million, plus pre-judgment interest, and a permanent, nonexclusive and royalty-free license to any Intel intellectual property embodied in AMD's own 386 microprocessor, including the x86 instruction set. Confirmation of the award was upheld by the California Supreme Court at *Advanced Micro Devices, Inc. v. Intel Corp.,* 9 Cal.4th 362, 36 Cal.Rptr.2d 581 (1994). According to AMD, the arbitrator expressed the hope that the consequent competition would result in an expanded market with appropriate profit margins and benefit to consumers through lower prices.

**B. Intel's Anti-Competitive Conduct Begins**

15. After confirmation of AMD's arbitration award, AMD settled all outstanding disputes with Intel in a 1995 agreement that gave AMD a shared interested in the x86 instruction set but required AMD to develop its own architecture to implement those instructions. AMD delivered its first chip without Intel pin-compatibility, the Athlon microprocessor in 1999. The Athlon

Page 3

microprocessor advanced past Intel technology, beat Intel to market with a new generation Windows microprocessor, and broke the 1GHz speed barrier.

16. AMD again had a breakthrough when it introduced an extension of the x86 architecture that took Windows processors into the realm of 64-bit proprietary instruction set. In April 2003, AMD brought to market its Opteron microprocessor for servers. Opteron was the first x86 backward compatible 64-bit chip, meaning that it could run 64-bit as well as older 32-bit software. The computing industry hailed AMD's new chip as an engineering triumph.

17. Intel prevented AMD's market share from keeping pace with AMD's technical leadership. Intel unlawfully maintained the monopoly that IBM bestowed upon it and systematically excluded AMD from any meaningful opportunity to compete for market share by preventing companies that buy chips from using AMD processors. This relegated AMD to the low-end of the market and prevented AMD from achieving the minimum scale necessary to become a full-fledged, competitive alternative to Intel. Furthermore, Intel erected impediments to AMD's ability to increase its production capacity for the next generation of AMD's state of the art microprocessors.

**C.     Intel's Exclusion of Competitors in the x86 Microprocessor Market**

18. Intel has a dominant position in the personal computing industry because the x86 version of Windows and Linux operating systems have produced an enormous installed base of Windows and Linux compatible applications that can run only the x86 instruction set. Non x86 microprocessors are not reasonably interchangeable with x86 microprocessors because none can run the x86 Windows or Linux operating systems or the application software written for them.

19. The relevant product market in which to assess Intel's x86 microprocessor position is x86 microprocessors because a monopolist in this market would be able to raise the prices of x86 microprocessors above competitive level without losing so many customers to other microprocessor manufacturers as to make this increase unprofitable.

20. The relevant geographic market in which to assess Intel's x86 microprocessors position is the United States. The United States is a submarket of the worldwide market.

Page 4

21. Intel dominates the worldwide x86 microprocessor market with a market share in excess of 90% as measured by revenue. AMD's revenue share of x86 microprocessors has remained around 9% and all other microprocessor manufacturers share the remaining 1%. Intel has captured at least 80% of worldwide x86 microprocessor unit sales in seven of the last eight years. Since 1999, AMD's volume share has stagnated around 15%.

22. Intel's x86 family of microprocessors do not face any meaningful competition other than from AMD. There are enormous barriers to entry in the relevant market. Chip manufacturing plants cost between $2.5 and $3 billion.

### D. Intel Uses Original Equipment Manufacturers as Distributors

23. The majority of x86 microprocessors are used in personal laptop and desktop computers. Most microprocessors are sold to a handful of large ("Tier One ") Original Equipment Manufacturers ("OEMs") such as HP, Dell, IBM, Gateway and Fujitsu/Fujitsu Siemens. Toshiba, Acer, NE and Sony are also considered Tier One OEMs in the notebook segment of the personal computer market. HP and Dell are the dominant companies, collectively accounting for over 30% of worldwide desktop and mobile sales. HP, Dell, IBM and Gateway are U.S. based companies, and all but Gateway have U.S. manufacturing operations.

24. OEMs have adopted a variety of business models, including sales directly to customers through web-based e-commerce, sales through company – employee sales staffs (who target IT professionals and Fortune 1000 companies) and sales through a network of independent distributors. Intel and AMD compete to have OEMs incorporate their microprocessors into retail platforms but also to convince retailers to allocate shelf-space so that the platforms containing their respective microprocessors can be purchased in the retailers' stores.

25. The OEMs have become undifferentiated distributors for the Intel microprocessor platform, offering "Intel Inside" and "Centrino" computers largely indistinguishable from those of other rivals. The "Intel Inside" and "Centrino" programs financially reward OEMs for branding their PCs as Intel machines. As their products have become commoditized, the Tier One OEMs operate on small or negative margins, and the overwhelming portion of PC profit flows to Intel. Therefore, OEMs are susceptible to Intel's economic coercion, described below.

# THE WRONGFUL CONDUCT

26. Using various financial and other exclusionary business strategies, Intel has maintained its x86 microprocessor monopoly that in effect limits its customers' abilities and/or incentives to deal with AMD, including:

a) direct payments in return for exclusivity and near-exclusivity;

b) discriminatory rebates;

c) discounts and subsidies conditioned on customer loyalty that have the practical and intended effect of creating exclusive or near-exclusive dealing arrangements; threats of economic retaliation against those (i) who give, or even contemplate giving, too much of their business to AMD, (ii) who refuse to limit their AMD business to Intel-approved models, brands, lines and/or sectors, or (iii) who cooperate too closely with AMD's promotion of its competitive processors; and

d) misuse of industry standards-setting processors so as to disadvantage AMD products in the marketplace.

27. Intel has targeted customers to prevent AMD from building market share and to keep Intel's customers dependent on Intel for very substantial amounts of products. In this way, OEMs remain vulnerable to continual threats of Intel retaliation, AMD remains capacity-constrained, OEMs remain Intel-dependent, and Intel thereby perpetuates its economic hold by unlawfully exploiting its exiting market share. Intel is impeding AMD's competitive growth, thereby facilitating its next round of market foreclosing actions. Consequently, AMD's ability to benefit from its current technological advances is curtailed to the harm of potential customers and consumers.

**A. Intel's Practices Directed at OEMs**

28. Intel is the exclusive or near-exclusive provider of microprocessors to Dell, Sony Toshiba, NEC, Fujitsu, Hitachi, Gateway and Supermicro. Intel's exclusive dealings with these OEMs are unlawfully exclusionary, have no procompetitive purpose and are intended to maintain Intel's monopoly for x86 microprocessors.

29.     Intel has also used its market power to purchase exclusive or near exclusive product-line, channel or geographic restrictions in an effort to stifle competition.  Specifically, Intel bought limited exclusivity from OEMs in order to exclude AMD from the most profitable lines or from channels of distribution best tailored to take advantage o AMD's price/performance advantage over Intel.  By paying discriminatory discounts, subsidies or payments, Intel has largely foreclosed AMD from sales with respect to commercial desktop computers manufactured by the few major OEMs who have not ceded total exclusivity to Intel.

30.     In order to maintain its monopolistic and anticompetitive conspiracy, Intel imposed on OEMs a system of first-dollar rebates that have the practical and intended effect of creating exclusive or near-exclusive dealing arrangements and artificially foreclosing AMD from competing for a meaningful share of the market.  Generally, rebate schemes operate as follows: quarterly, Intel unilaterally establishes for each of its customers a target level of purchases of Intel microprocessors.  If the customer reaches this target, it is entitled to a rebate on all of its purchases during that quarter.  Typically, these rebates are in the vicinity of 8-10% of the price paid.  Intel provides the rebate in cash at the quarter's close.  OEMs operate on thin margins, so qualifying for an Intel rebate frequently means the difference between reporting a profit or a loss in quarterly earnings.

31.     These rebates stand in stark contrast to the volume discounts offered on a non-discriminatory basis by some manufacturers.  Here, Intel's system is a system of "penetration" or "loyalty" rebates designed to exclude AMD from a substantial portion of the market.  Intel intentionally sets this rebate trigger at a level of purchases it knows to constitute a dominant percentage of a customer's needs.  It is able to develop discriminatory, customer-by-customer unit or dollar targets that lock that percentage (without ever referencing it) because industry publications accurately forecast and track anticipated sales and because OEM market shares – which industry publications also report weekly, monthly and quarterly – do not change significantly quarter to quarter.

32.     Intel's retroactive rebates operate to price microprocessors so low that competitors like AMD are at such a disadvantage that they cannot overcome Intel's market dominance.  By way of example, AMD can only achieve significant sales if it offers a price that makes the customer

Page 7

indifferent between getting the Intel rebate and getting an overall equivalent deal on AMD microprocessors. AMD is forced to discount its price more than Intel just to match the Intel discount, because Intel's past predatory practices provide a significant base of assured demand which enables Intel to inexpensively spread its first-dollar discount. Importantly, this new base of demand – driven by the OEMs purchasing – will enable Intel to repeat its exclusionary practice when the next line of models is unveiled.

33. Most, if not all, OEMs must purchase significant quantities of Intel product because (1) other competitors such as AMD are too small to service their needs while continuing to satisfy their other customers' demand; (2) to meet customer expectations, OEMs must assure commercial computer buyers that specifications, including the microprocessor, will remain unchanged during the product's lifecycle; and (3) Intel has encouraged end-users to specify that processors be of the same family among similar computers in one installation, as this is perceived to increase reliability. Intel uses its retroactive rebates to make its large, captive market share self-perpetuating. In any given quarter, AMD cannot economically match Intel's retroactive rebates because it competes for too small a share of the customer's volume over which to spread the dollars necessary to equal the customer's total Intel cost savings. As a result, AMD loses the business and thus goes into the next selling cycle with Intel imbedded in additional customer product over which Intel can spread its rebates. This serves to again artificially restrain Intel's competitors' opportunities to match Intel's ensuing round of retroactive rebates. Intel's conduct serves the purpose and has the effect of restraining trade.

34. In furtherance of this restraint on trade, Intel extracts significant penalties from OEMs that do not meet Intel's targets. By way of example, during the fourth quarter of 2004, AMD succeeded in getting on the HP retail roadmap for mobile computers, and its products sold very well. Intel responded by withholding HP's fourth quarter rebate check and refusing to waive HP's failure to achieve its targeted rebate goal. Instead, Intel allowed HP to make up the shortfall in succeeding quarters when HP promised Intel at least 90% of HP's mainstream retail business.

35. All of Intel's rebate schemes are discriminatory and market-foreclosing. If the customer chooses to purchase any significant quantity of microprocessors from AMD, it will not

Page 8

qualify for its rebate, and its price will be higher on all the Intel processors it buys across the board. By tailoring targets to each customer's size and anticipated volume, Intel locks up significant percentages of the market much more effectively and at a lesser cost to itself – but with greater harm to AMD and ultimately individual and commercial consumers – as compared to offering such rebates for comparable purchase levels to all customers on a nondiscriminatory basis.

36. Intel's use of retroactive rebates results, in some cases, in predatory below-cost pricing on incremental sales, and Intel rebates can lead to incremental Intel units being offered to OEMs for no cost, resulting in competitors being 'boxed out' of the market.

37. Intel's rebate practices exacerbate normal impediments to entry and expansion since the use of retroactive rebates to limit competitors' sales of microprocessors to a small share of an OEMs business increases the obstacle to inducing the OEM to use a competitors' platform. OEMs incur substantial expense in designing and engineering a new computer, and make the investment only if they foresee a substantial chance of selling a sufficient volume to recoup it. Intel's rebates and other business strategies effectively cap the volumes of competitors' products that an OEM can sell.

38. Intel's dealings with OEMs are unlawfully exclusionary, have no procompetitive justification and are intended to maintain its monopoly.

39. Intel also uses threats of retaliation to deter OEMs from dealing with its competitors, including AMD. Intel's threats include the following: a) unilaterally reducing or withdrawing a discount, rebate or subsidy; b) imposing a discriminatory price increase on a disfavored customer; b) extending a price cut to that customer's competitor; d) forcing retailers into dropping the customer's computers in favor of its competitor; e) delaying or disputing an allowance or rebate; and f) threatening to delay or curtail supplies of scarce processors or essential technical information.

40. Intel has reportedly interfered with AMD's product launches in furtherance of its antitrust violations. Reportedly, Intel disrupted AMD's launch of its Athlon64 by coercing Acer, Lenovo, NEC-CI and Best Buy to reduce their participation in AMD's product launch. Intel also reportedly interfered with AMD's launch of its Opteron server chip.

Page 9

41. Intel also uses product bundling as an exclusionary weapon in a variety of ways. Intel's most common deployment is when it bids for a new OEM platform, it bundles microprocessors with free chipsets or motherboards, often offered in amounts exceeding the OEMs requirements for the new platform. This effectively prohibits competition because competitors such as AMD do not produce motherboards or chipsets. Therefore, in order to match Intel's bundling, AMD must extend a discount on its microprocessors that will not only match any Intel discount on the microprocessors themselves, but will also compensate the OEM for the savings it will lose on the independent Intel chipset and motherboard purchase. Such Intel dealings with OEMs are unlawfully exclusionary, have no procompettive justification and are intended to maintain its monopoly.

**B.  Intel's Practices Directed At Distributors**

42. Intel also improperly restricts distributors from carrying AMD processors or selling AMD products into markets it deems strategic. By way of example, AMD reported that Intel entered into an exclusive deal with one of the largest U.S. distributors, Synnex. Given Intel's 80% plus market share, there is no procompetitive justification for this agreement.

43. Intel also offers discounts and rebates to distributors who agree not to do business with Intel's competitors. Additionally, Intel offers a wide variety of special programs for distributors who carry Intel microprocessors exclusively: marketing bonuses, increased rebates, credit programs for new customers, payment for normal freight charges and special inventory assistance, such as credits to offset inventory costs.

44. Intel also offers retroactive rebates, triggered when a distributor reaches a prescribed buying quota. Intel does not inform distributors of the goals it has set for the distributors or the precise consequences of failing to meet them. As a result, every AMD chip they purchase, they buy at their peril. Such Intel dealings with distributors are unlawfully exclusionary, have no procompetitive justification and are intended to maintain Intel's monopoly.

**C.    Intel's Practices Directed At Retailers**

45.    Both internationally and in the U.S., approximately one fifth of the desktop and notebook computers are purchased through retail stores. Best Buy and Circuit City are the largest retailers of these computers in the United States.

46.    Chipmakers face two steps to get their platform on retail shelves. First, they must convince one or more OEMs to build machines using their microprocessors at a suggested retail point. Second, they must convince retailers to stock and devote shelf space to these machines. Major retailers demand market development funds ("MDF") in exchange for shelf space. MDF can consist of cooperative advertising support, but more frequently it comprises a marketing-related opportunity that a chipmaker must buy for tens of thousands of dollars, for example, space in a Sunday circular, an in-store display or an Internet training opportunity with the chain's sales staff.

47.    Historically, Intel enjoyed an advantage over AMD at retail because using many of the strategies described above, it has had greater access to the OEMs roadmaps and the ability to exert pressure to keep AMD out of their product plans. Also, it has significantly greater financial resources with which to buy retail space.

48.    Intel leveraged these advantages by making exclusive deals with many key retailers. AMD reported that, until recently, Office Depot declined to stock AMD-powered notebooks regardless of the amount of MDF. Office Depot declines to allow AMD's products on its shelves for fear of losing its "premier" status with Intel.

49.    Because of Intel's anticompetitive conduct, AMD has been totally shut out of many retailers' stores. Intel's dealings with retailers are unlawfully exclusionary, have no procompetitive justification and are intended to maintain its monopoly.

**D.    Intel's Exclusionary Standard Setting and Technical Abuses**

50.    AMD reported that Intel has employed, and continues to employ, a variety of tactics that are designed to and have the effect of excluding and/or discouraging AMD's full and active participation in the development of important industry standards to ensure broad compatibility and

denying AMD timely access to such standards. Intel's efforts have inhibited AMD's ability to vigorously compete in the market.

51. For example, Intel and AMD each develop and manufacture memory controller technologies that allow their processors and related components to communicate with memory. Intel designs and manufactures an entirely separate chip for this purpose, known as the Graphics and Memory Controller Hub. On the other hand, AMD embeds its memory controllers directly into its processors thereby dispensing with the need for an extra chip and speeding up communication. Both companies need to know and have access to memory standards well in advance of producing their processors and/or chipsets so that their memory controller designs will be compatible with the next generation of memory devices.

52. Intel excludes AMD by avoiding an open standard setting committee. Intel is currently coercing the major memory producers into signing non-disclosure agreements and working exclusively with Intel in a secret committee to develop the next generation of memory interface standard. This has the effect of preventing AMD from completing the design of its processor memory controllers until Intel permits memory manufacturers to communicate their interface specification to the industry.

53. This scheme allows Intel to tighten its control over the industry by converting what the component manufacturers intend as a public standard into a proprietary one, and thereby guarantees itself an unearned head-start and unfair competitive advantage.

54. Intel also markets microprocessor-related products targeted at AMD customers that are designed to compromise the performance of the AMD microprocessors. For example, Intel has intentionally designed its compilers (software used to optimize the speed and efficiency of applications that use Intel's x86 microprocessor) to intentionally degrade when a program is run on an AMD platform. AMD reported that Intel designed its compiler to compile computer code along several different paths. Some paths are executed when the programs runs on an Intel platform and others are executed when the program is operated on an AMD platform. If the code paths detect a "Genuine Intel" microprocessor, it executes a fully optimized compiler. However, if the code paths detect an AMD microprocessor, it executes a different code path that will degrade the program's

performance. Intel's conduct serves no legitimate procompetitive purpose and can and only serves to further maintain Intel's monopoly.

## CLASS ACTION ALLEGATIONS

55. Plaintiff brings this action individually and as a class action pursuant to Federal Rules of Civil Procedure Rule 23(b)(2) and (b)(3), on behalf of himself and the following Class (the "Class"):

> All persons and entities residing in the United States who purchased in the last four years a microprocessor in the United States indirectly from Intel. Specifically excluded from this Class are: Intel, the officers, directors or employees of Intel; any entity in which Intel had a controlling interest; and any affiliate, legal representative, heir or assign of Intel. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

56. Although Plaintiff does not know the exact number of Class members, since such information is within the exclusive control of Defendant, Plaintiff believes that, due to the nature of the trade and commerce involved, Class members are sufficiently numerous, most likely hundreds of thousands of purchasers, and geographically dispersed throughout the United States, that joinder of all Class members is impracticable.

57. Plaintiff's claims are typical of the claims of the Class in that Plaintiff is an indirect purchaser of an x86 microprocessor, all Class members were damaged by the same wrongful conduct of Defendant and its co-conspirators as alleged herein, and the relief sought is common to the Class.

58. Numerous questions of law and fact arise from Intel's anticompetitive conduct that re common to the Class. Among the questions of law and fact common to the Class are:

(a) whether Intel formed and operated a combination or conspiracy to fix, raise, maintain or stabilize the prices of, or allocate the market for, microprocessors;

Page 13

      (b)      whether Intel's behavior caused microprocessor prices to be higher than they would have been in the absence of Intel's conduct;

      (c)      whether Intel's co-conspirators' behavior caused microprocessors prices to be higher than they would have been in the absence of their conduct;

      (d)      whether Intel's conduct caused injury to Plaintiff and the Class, and if so, the appropriate Class-wide measure of damages and appropriate injunctive relief.

59. These common questions of law and fact are common to the Class, and predominate over any other questions affecting only individual Class members.

60. Plaintiff will fairly and adequately represent the interests of the Class in that Plaintiff is a typical indirect purchaser of x86 microprocessors and has no conflicts with any other member of the Class. Furthermore, Plaintiff has retained competent counsel experienced in antitrust and Class action litigation.

61. This Class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.

62. Prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Intel.

63. Injunctive relief is appropriate as to the Class as a whole because Intel has acted or refused to act on grounds generally applicable to the Class.

## TRADE AND COMMERCE

64. During the Class Period, Intel and its co-conspirators sold, shipped and marketed substantial quantities of x86 microprocessors in a continuous and uninterrupted flow of interstate and international commerce to customers located in states and countries other than the states in which Intel is located.

Page 14

1       65.     The business activities of Intel that are the subject of this Complaint were within the
2 flow of, and substantially affected, interstate and foreign trade and commerce.

3       66.     During the Class Period, Intel, which is the largest x86 microprocessor manufacturer
4 in the world, had most of the x86 microprocessor sales in the relevant market. Intel has sufficient
5 market share of the x86 microprocessor market to exercise considerable market power.

## ANTITRUST INJURY

67.     The above restraint of trade has had the following effects, among others:

(a)     during the relevant time period price competition in the sale of x86 microprocessors by Intel and its co-conspirators has been unlawfully restrained, suppressed and/or eliminated throughout the United States;

(b)     during the relevant time period prices for x86 microprocessors sold by Defendant and its co-conspirators have been raised, fixed, maintained and stabilized at artificially high and supracompetitive levels throughout the United States; and

(c)     during the relevant time period indirect purchasers of x86 microprocessors from Defendant and its co-conspirators have been deprived of the benefit of free and open competition in the purchase of x86 microprocessors.

68.     Intel's unlawful conduct caused and will continue to cause substantial harm to competition in the market for x86 microprocessors. Were it not for Intel's anticompetitive conduct, AMD and other competitors would be able to compete for microprocessor business on competitive merit, both domestically and internationally, bringing customers and end-product individual and commercial consumers lower prices, greater innovation and freedom of choice.

69.     As a direct and proximate result of the unlawful conduct of Defendant and its co-conspirators, Plaintiff and members of the Class have been injured in their business and property in that they paid more for x86 microprocessors than they otherwise would have paid in the absence of the unlawful conduct of Defendant and its co-conspirators.

SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA 94111
(415) 788-4220

## **DAMAGES**

70. During the Class Period, Plaintiff and the other members of the Class purchased x86 microprocessors indirectly from Intel , or its subsidiaries, agents, and/or co-conspirators, and, by reason of the antitrust violations herein alleged, paid more for such products than they would have paid in the absence of such antitrust violations. As a proximate result of Intel's unlawful contract, combination or conspiracy, Plaintiff and the other members of the Class have sustained damages to their business and property in an amount to be determined at trial.

## **FIRST CLAIM – VIOLATION OF 15 U.S.C § 1**

71. Plaintiff incorporates by reference as though fully set forth herein, all the allegations set forth above.

72. Beginning at least as early as July 2001, the exact date being unknown to Plaintiff and exclusively within the knowledge of Intel , Intel and its co-conspirators, by and through their officers, director, employees, agents or other representatives, entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The contracts, combinations and conspiracies are continuing and will continue unless enjoined.

73. Defendant, by its unlawful conspiracy, artificially fixed, raised, inflated and maintained the market price of x86 microprocessors as herein alleges in violation of 15 U.S.C. § 1.

74. The contract, combination or conspiracy consisted of a continuing agreement, understanding and concert of action between Defendant and its co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and/or allocate the market for, x86 microprocessors sold in the United States.

75. For the purpose of formulating and effectuating their contract, combination or conspiracy, Intel and its co-conspirators did those things they contracted, combined or conspired to do, including, for example:

(a) participating in meetings and conversations to discuss the prices of and/or allocate the market for x86 processors;

  (b) agreeing to manipulate supply of x86 microprocessors;

  (c) entering into agreements for exclusive or near exclusive dealing;

  (d) entering into arrangements for secret funding, rebates and discounts;

  (e) monitoring and controlling the activities of AMD customers, sanctioning those who acted contrary to the interests of Intel and its co-conspirators; and

  (f) employing other mechanisms designed to divert sales and customers away from AMD or other competitors.

76. As a result, purchasers of x86 microprocessors were deprived of free and open competition, and forced to pay supracompetitive prices.

77. As a direct and proximate result of the unlawful conduct alleged herein, Intel and its co-conspirators in furtherance of their continuing contract, combination or conspiracy, Plaintiff and other members of the Class have been injured in their business and property because they have paid more for x86 microprocessors than they would have paid in the absence of Intel's and its co-conspirators' price fixing.

78. In addition, it has been publicly reported that the European Commission is investigating Intel to determine whether Intel is acted in violation of their antitrust regulations.

## PRAYER

WHEREFORE, Plaintiff demands judgment Intel as follows:

A. A declaration that this action is a proper class action under Federal Rules of Civil Procedure, Rule 23(a), (b)2) and (b)(3) on behalf of the Class as defined herein, and an Order directing that reasonable notice of this action, as provided by Federal Rules of Civil Procedure, Rule 23(c)(2), be given to each member of the Class;

B. A declaration that the unlawful combination and conspiracy alleged herein is an unreasonable restraint of trade of commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C. An injunction enjoining, preliminarily and permanently, Intel from continuing the unlawful combination and conspiracy alleged herein;

Page 17

D. An award to Plaintiff and each member of the Class of damages, as provided by law, and joint and several judgments in favor of Plaintiff and each member of the Class against Intel, and its co-conspirators, in an amount to be trebled in accordance with the antitrust laws;

E. An award to Plaintiff and the Class for the costs of this suit (including expert fees), and reasonable attorneys' fees, as provided by law; and

F. An award for such other and further relief as the nature of this case may require or as this Court deems just, equitable and proper.

## JURY DEMAND

Plaintiff demands a trial by jury pursuant to Federal Rules of Civil Procedure, Rule 38(b).

DATED: July 18, 2004

By: /s/ Juden Justice Reed

ROBERT C. SCHUBERT
JUDEN JUSTICE REED
PETER E. BORKON
SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, California 94111
Telephone: (415) 788-4220

*Attorneys for Plaintiff and the Class*

Page 18